**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GINA DAMIANI,<br><br>Plaintiff,<br><br>v.<br><br>CMG MORTGAGE INC. d/b/a CMG FINANCIAL, et al.,<br><br>Defendants. | No. 1:22-CV-04783-RMB-EAP<br><br>**OPINION** |
| CMG MORTGAGE INC. d/b/a CMG FINANCIAL,<br><br>Counterclaimant,<br><br>v.<br><br>GINA DAMIANI,<br><br>Counterclaim-Defendant. | |

**APPEARANCES:**

CHARLES JOSEPH KOCHER
TYLER J. BURRELL
MCOMBER, MCOMBER AND LUBER
50 LAKE CENTER DRIVE, SUITE 400
MARLTON, NJ 08053

       Counsel for Plaintiff

MICHAEL ANTHONY IANNUCCI
BLANK ROME LLP
ONE LOGAN SQUARE
PHILADELPHIA, PA 19013

       Counsel for Defendant

**RENÉE MARIE BUMB, Chief United States District Judge**

Plaintiff Gina Damiani ("Plaintiff") brings this action against Defendant CMG Mortgage, Inc., alleging retaliation in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.* ("CEPA"). For the reasons stated herein, the Motion for Summary Judgment (ECF No. 55) will be granted.

## I.  Background

On August 30, 2021, Plaintiff began working at CMG Mortgage Inc. d/b/a CMG Financial ("CMG") as a Senior Loan Officer. (Statement of Undisputed Material Facts ["SUMF"], ECF No. 55-3 at ¶ 1). Plaintiff was an at-will employee. (Id. at ¶ 2). When she was hired, Plaintiff executed a Compensation Agreement that provided for two $20,000 sign-on bonus payments, for a total of $40,000. (Id. at ¶¶ 3–4). In order to keep the bonus payments, Plaintiff agreed to maintain her employment with CMG "for a minimum of twelve months." (Id. at ¶ 5). Plaintiff received the bonuses on September 10, 2021 and October 8, 2021. (Id. at ¶ 6). Plaintiff was terminated on April 5, 2022, effective April 6, 2022, approximately seven months after she started. (Id. at ¶ 75). Plaintiff was not employed at CMG for twelve months. (Id. at ¶ 7). Plaintiff has not repaid her sign-on bonuses. (Id. at ¶ 8).

Plaintiff's position as a Senior Loan Officer "included 'originating mortgage loans by meeting with potential borrowers to determine appropriate [loan] product, obtain proper documentation and follow through with the entire loan process.'" (Id. at ¶ 10).

CMG's Employee Handbook sets out CMG's Loan Fraud Zero Tolerance Policy, which requires all employees "to report any suspicious activity that could be fraud in a loan application to CMG's Fraud Investigations Department (also referred to as Fraud Investigation Group or 'FIG')." (Id. at ¶ 12). When Plaintiff was hired, she signed an acknowledgement of the Employee Handbook. (Id. at ¶ 11).

Over the seven months of her employment, fifteen loans that Plaintiff originated were investigated by FIG "for various red flags and potentially fraudulent activity." (Id. at ¶ 66). FIG created both individual investigation reports related to certain loans with fraud concerns, as well as a comprehensive Fraud Investigative Report, including each of the fifteen loans with fraud concerns. (Id. at ¶¶ 67, 68). In deposition testimony, CMG's corporate representative testified that seven of these loans formed the basis for Plaintiff's termination, and these are the loans that Plaintiff addresses in her briefing.[1] (Plaintiff Deposition ["Pl. Dep."], ECF No. 55-28 at 23). Thus, this Court will recount additional information about the seven loans that CMG testified provided the basis for termination.

The Fraud Investigative Report summarizes the investigations into fifteen loans Plaintiff originated. (SUMF, ECF No. 55-3 at ¶ 68). Looking to the report, the issues FIG flagged from their investigation into these seven loans included that, one, Plaintiff appeared to be working for Smart Marketing LLC in violation of CMG

---

[1] Defendant details additional loan investigation beyond these seven in their statement of facts and briefing; however, this Court will focus only on the loans that CMG testified served the basis of Plaintiff's termination and that Plaintiff specifically and individually addresses in her briefing.

employment terms and, two, that the Plaintiff used CMG resources to benefit an external credit repair company. (SUMF, ECF No. 55-3 at ¶ 69; FIG Investigative Report ["FIG Report"], ECF No. 55-17). Specifically, "Plaintiff sent CMG generated credit reports to Smart Marketing and maintained a page on Smart Marketing's website that linked directly to Plaintiff's CMG website." (SUMF, ECF No. 55-3 at ¶ 70). Plaintiff does not dispute her affiliation with Smart Marketing LLC, although she does dispute that she "was terminated based on FIG's concerns with Plaintiff's association with Smart Marketing." (Id; Response to SUMF, ECF No. 56-4 at ¶ 69). Again, looking to the report, these issues were flagged in the investigations of loans for three borrowers, borrower Carlucci, borrower Starett, and borrower Ursino. (FIG Report, ECF No. 55-17 at 3–5, 6, 14). The FIG report also noted that Plaintiff sent borrower Starett's NPI and CMG proprietary information from a non-CMG email account. (Id. at 6).

With respect to loan-specific fraud issues, in the report FIG pointed to concerns of occupancy fraud for a loan for borrower Villalva and borrower Ursino, a straw buyer with respect to a loan for borrower Smith, income fraud for a loan for borrower Robinson, and concerns of Plaintiff knowingly forging disclosures and negotiating a loan with someone other than the borrower for loans for borrower Smith and borrower Ellerbe. (Id. at 22).

Plaintiff points to the treatment of the loan for borrower Darrien Robinson in support of her alleged whistleblowing activity. (SUMF, ECF No 55-3 at ¶¶ 107–09). In November 2021, Plaintiff originated a loan application for Robinson. (Id. at ¶ 20,

Robinson Application, ECF No. 55-12). In his application, Robinson reported his employment as a lawn technician at Green Lawn Fertilizing, reporting a monthly income of $4,000. (SUMF, ECF No. 55-3 at ¶ 21). He reported that he had been working there for three months, beginning August 1, 2021. (Robinson Application, ECF No. 55-12). On December 9, 2021, underwriting suspended the loan because the income amount included overtime pay, and excluding overtime pay, "Mr. Robinson's debt-to-income ratio exceeded the 65% cap per applicable guidelines." (SUMF, ECF No. 55-3 at ¶ 22).

Four days later, on December 13, 2021, Robinson updated his application with new employment, as a commercial truck driver with Smart Trucking 1, LLC ("Smart Trucking"), reporting a monthly salary of $4,333.33. (Id. at ¶ 23). Robinson provided an offer letter to support his reported employment with Smart Trucking. (Id. at ¶ 24). The offer letter is undated, but notes that the position began on December 2, 2021, and the first payment would be received on December 17, 2021. (Id.; Offer Letter, ECF No. 55-14). The offer letter is signed by Kelly Campbell. (Id.). FIG investigated this loan. (SUMF, ECF No. 55-3 at ¶ 29). Plaintiff was aware that CMG had concerns about whether Smart Trucking was a legitimate company. (Id. at ¶ 93).

It is undisputed that Plaintiff knows the purported employer, Kelly Campbell, and also knows the borrower, Robinson. (Id. at ¶¶ 31–32). Robinson is friends with Plaintiff's son. (Id. at ¶ 32). Campbell is the president of Smart Marketing Group, LLC, the credit repair company discussed above that Plaintiff had a referral

agreement with. (Id. at ¶¶ 30, 31). Moreover, Plaintiff testified that she asked Campbell if Robinson could have a job. (Id. at ¶ 33).

The Fraud Investigation Report states that "FIG reviewed the provided income documentation and noted red flags throughout. The offer letter was generic in format, did not include a date, was missing the candidate/borrower's information, was missing contact information for the company (email and phone number), and did not include a section for the borrower to sign/accept employment." (Robinson FIG Investigative Report ["Robinson Report"], ECF No. 55-13 at 2). After investigating Smart Trucking, and calling the associated phone number, the investigation report concludes that Smart Trucking "does not appear to be an active business entity" and "the borrower does not appear to be licensed to drive freight trucks." (Id. at 3). FIG recommended obtaining additional documentation to confirm this employment. (Id.). Plaintiff provided a new phone number. (SUMF, ECF No. 55-3 at ¶ 35). FIG investigated the phone number and determined that it was for the registered agent, not Smart Trucking itself. (Id. at ¶ 36). FIG also reported that the paystubs provided "match closely to, if not exactly like a novelty website where one could pay for earning statements that are made to look like ADP checks." (Robinson Report, ECF No. 55-13; SUMF, ECF No. 55-3 at ¶ 36). Pursuant to FIG's recommendation, CMG did not move forward with Robinson's loan. (Id. at ¶ 38).

Plaintiff alleges that CMG employee Erin Connor overstepped in investigating Robinson's employment. In her Complaint, Plaintiff alleges that "Ms. Connor

deceitfully called the employer of one of Plaintiff's clients, a CMG mortgage applicant, posing as if Ms. Connor was looking for a job herself in order to surreptitiously discover more information about the client and/or to verify certain information." (Id. at ¶ 107). On December 22, 2021, Plaintiff texted her direct supervisor, Adam Heiligman ("Heiligman") stating "not sure what we can do about the Robinson loan but I provided the entity as required the check the wvoe [written verification of employment] the offer letter showing the money in the account.. email from smart trucking showing deposit from smart trucking.. the guy is mad and I don't know what to tell the borrower?" (Id. at ¶ 84). The guy refers to the purported employer, Campbell. (Id. at ¶ 85). On December 28, 2022, in another text message to Heiligman, Plaintiff asked if they could "get someone else involved," stating "this is overly frustrating.. I don't like how they are doing this.. if I didn't know this person was in business it would be different but I'm overly over this treatment." (Id. at ¶ 88).

On January 3, 2022, in an email to Heiligman as well as two employees in the processing department, Connie Gelsomini and Cece Watson, Plaintiff objected to the handling of this loan, and stated that "some lines have been crossed." (Id. at ¶ 90; January 3, 2022 Email, ECF No. 55-16). In her deposition testimony, Plaintiff stated that "they didn't treat any other customer like this. They didn't know—they weren't calling and pretending like they were someone else on my other files." (Pl. Dep., ECF No. 55-6 at 107).

On March 25, 2022, Plaintiff had a conversation with Kemi Omotoso, CMG HR Business Partner, via phone. (SUMF, ECF No. 55-3 at ¶ 99). During this

conversation, Plaintiff and Omotoso discussed Plaintiff's concern that her files were being scrutinized by underwriting and how to submit files that did not prompt so many questions back. (Id. at ¶ 100). In the Complaint, Plaintiff alleges that during this phone call she also discussed with Omotoso that Erin Connor engaged in fraudulent or deceptive practices. (Id. at ¶ 107; Complaint, ECF No. 1-2 at ¶ 9). This alleged fact is clearly disputed. Plaintiff alleges that Robinson was targeted based on "discrimination." (SUMF, ECF No. 55-3 at ¶ 108; Pl. Dep., ECF No. 55-6 at 78). Plaintiff also testified that in March of 2022 she told HR that she believed the investigation into the Ellerbe loan was discrimination. (Id. at 79). She admitted that she did not report to CMG any other specific loans or borrowers that she believed involved discrimination. (Id.). Plaintiff alleges that she told her supervisor, Heiligman, about the issues with the Robinson loan in January 2022 and that she raised the discrimination again in March 2022 with HR representative Kemi Omotoso. (SUMF, ECF No. 55-3 at ¶¶ 97, 107).

The loan investigation reports from FIG were sent to CMG senior leadership, specifically Chief Risk and Compliance Officer Tara Petersen and Vice President and East Division Manager Tammy Turner, who "reviewed FIG's reports and agreed that termination was required." (Id. at ¶ 71). Turner also discussed the decision with CMG's Executive Vice President Charlie Rogers and CMG Senior Vice President of Retail Tony Giglio. (Id. at ¶ 72). CMG Chief Operating Officer Kim Callas approved Pettersen's request to terminate on April 5, 2022. (Id. at ¶ 73). Before this time, "no one from CMG's Human Resources team was aware of the fraud investigations

being conducted by CMG's FIG team." (Id. at ¶ 74). Rather, "CMG's Chief Human Resources Officer, Melissa Harbourne, testified that HR 'took the recommendation to terminate and moved forward with the termination' and that she 'was not involved in the fraud investigation.'" (Id. at ¶ 76).

Plaintiff obtained a new full-time position as a loan officer with another mortgage company less than a week after her termination. (Id. at ¶ 77).

On June 23, 2022, Plaintiff filed a Complaint in the Superior Court of New Jersey. (ECF No. 1-2). On July 27, 2022, Defendant CMG Mortgage Inc. d/b/a CMG Financial ("Defendant") filed a notice of removal. (ECF No. 1). Defendant filed an Answer and Counterclaim on September 16, 2022. (ECF No. 13). On September 28, 2022, Plaintiff filed an Answer to Counterclaim. (ECF No. 18).

On February 9, 2024, Defendant filed a Motion for Summary Judgment. (ECF No. 55). Plaintiff filed her Response in opposition on March 11, 2024. (ECF No. 56). Defendant filed its Reply on March 25, 2024. (ECF No. 57).

## II.   **Summary Judgment Standard**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." Gonzalez v. Sec'y of Dept of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Walsh v. Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id. In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561

F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment."). However, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

## III.   Analysis

Defendant seeks summary judgment dismissing Plaintiff's claim under CEPA and granting Defendant's counterclaim for breach of contract. This Court will first assess the CEPA claim and then proceed to the breach of contract counterclaim.

### a.   CEPA

Plaintiff claims her termination constituted retaliation in violation of CEPA, N.J. Stat. Ann. § 34:19–3. The New Jersey legislature enacted CEPA "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958, 971 (N.J .1994)). CEPA is remedial legislation that must be construed liberally to achieve its important social goals. Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1038–39 (N.J.2000); Kolb v. Burns, 727 A.2d 525, 531 (N.J.App.Div.1999).

To prevail on a CEPA claim, a plaintiff must prove four elements:

> 1) That he reasonably believed his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

2) That he performed a "whistle-blowing" activity as described in N.J. Stat. Ann. 34:19–3;

3) That an adverse employment action was taken against him; and

4) That a causal connection exists between the whistle-blowing activity and the adverse employment action.

Dzwonar, 828 A.2d at 900; Choy v. Comcast Cable Commc'ns, Inc., No. 08–4092, 2012 WL 253382, *8 (D.N.J. Jan. 26, 2012).

Since Plaintiff's CEPA claim depends on circumstantial evidence, the Court applies the three-step, burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Bocobo v. Radiology Consultants of S. Jersey, P.A., 477F. App'x 890, (3d Cir. Apr. 17, 2012) (citing Fleming, 751 A.2d at 1041). At the first step of the analysis, Plaintiff must establish a prima facie case of retaliation. Donofry v. Autotote Sys., Inc., 795 A.2d 260, 290–91 (N.J. App. Div. 2001); Kolb, 727 A.2d at 531. If the plaintiff satisfies this burden, a presumption arises that the employer unlawfully retaliated against her. Choy, 2012 WL 253382 at *8. The employer may rebut this presumption at the second stage of the analysis by articulating some legitimate, non-retaliatory reason for the termination decision. Donofry, 795 A.2d at 292 (citing Bergen Commercial Bank v. Sisler, 723 A.2d 944, 955 (N.J. 1999)). Although the burden of production shifts to the employer at this second step, the burden of persuasion remains at all times with the plaintiff. Donofry, 795 A.2d at 292 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)); Sisler, 723 A.2d at 955; Erickson v. Marsh & McLennan Co., 569 A.2d 793, 799

12

(N.J. 1990)). If the employer sets forth a non-discriminatory reason for its employment decision, the burden of production shifts back to the plaintiff, who now bears the ultimate burden of proving that he was subjected to retaliation. Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1140 (2005); Donofry, 795 A.2d at 270; Choy, 2012 WL 253382 at *8. The plaintiff may succeed at this third stage "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981) (citing McDonnell Douglas, 411 U.S. at 804–05). In other words, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could either (1) discredit the employer's articulated legitimate reasons or believe that an invidious retaliatory reason was a motivating or determinative cause of the employer's action. Zive, 867 A.2d at 1144 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

### i.  Prima Facie Case

The elements of a prima facie case of retaliation under CEPA are the same as the plaintiff's ultimate burden of proof on the issue. She must demonstrate that: 1) she reasonably believed that her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; 2) she performed a "whistle-blowing" activity as described in N.J. Stat. Ann. 34:19–3; 3) an adverse employment action was taken against her; and 4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Dzwonar, 828 A.2d at 900; Choy, 2012 WL 253382 at *8. Defendant argues that Plaintiff has failed to establish the first, second, and fourth prongs of his prima facie case. The Court addresses each issue in turn.

### ii. Reasonable Belief

As to the first prong, a CEPA plaintiff need not demonstrate that her employer "actually violated the law or a clear mandate of public policy" but simply that she "'reasonably believe[d]' that to be the case." Dzwonar, 828 A.2d at 900 (quoting Estate of Roach v. TRW, Inc., 754 A.2d 544, 552 (2000)). Thus, the plaintiff need only "set forth facts that would support an objectively reasonable belief that a violation has occurred." Id. at 901. The plaintiff can satisfy this burden by demonstrating "a substantial nexus between the complained-of conduct" and the law, rule, regulation, or public policy. Id.; Smith v. TA Operating LLC, No. 10–2563, 2010 WL 3269980, *3–4 (D.N.J. Aug. 17, 2010). If the trial court finds such a nexus, a jury must then "determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Dzwonar, 828 A.2d at 901–02.

Defendant explains that "the conduct that Plaintiff alleges that she 'blew the whistle on' is that Erin Connor 'called the employer of one of Plaintiff's clients, a CMG mortgage applicant, posing as if Ms. Connor was looking for a job herself in order to surreptitiously discovery [sic] more information about the client and/or to verify certain information . . . [and] never disclosed she worked for Defendant CMG

when she spoke to the employer of Plaintiff's client.'" (Defendant's Brief ["Def. Br."], ECF No. 55-2 at 24).

Plaintiff alleges that she reported conduct that she "reasonably believed to be unlawful and deceptive conduct." (Plaintiff's Brief ["Pl. Br."], ECF 56 at 10). Plaintiff calls the conduct "deceitful" and "discriminatory." (Id. at 11–12). Nowhere, however, does Plaintiff set forth the law or public policy that she alleges underlies her whistleblowing. Looking to the Complaint, Plaintiff alleged that Erin Connor's conduct in hiding the true identity of her employer when contacting the listed employer of borrower Robinson "constituted a 'violation of law, or a rule or regulation promulgated pursuant to law,' including without limitation lending discrimination under the Fair Housing Act, and/or 'practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee.' N.J.S.A. 34:19-3(a)(1)-(a)(2)." (Complaint, ECF No. 1-2 at ¶ 18).

The Court first assesses Plaintiff's reasonable belief that Connor's conduct constituted a fraudulent "activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity." N.J.S.A. 34:19-3(a)(2). The allegation that Connor misrepresented her identity to a borrower's reported employer, even if accepted as true, does not constitute fraud to a shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner

of the employer or any governmental entity as the borrower's reported employer does not fall under any of these categories. As such, Plaintiff cannot establish a substantial nexus between the reported behavior and fraudulent conduct as contemplated by CEPA.

Second, this Court assesses Plaintiff's reasonable belief that Connor's conduct violated the Fair Housing Act. Plaintiff alleges that the investigation into Robinson's employment was discrimination in violation of the Fair Housing Act. There is a substantial nexus between the complained of conduct—that Connor investigated Robinson's loan based on his race—and the prohibition against discrimination pursuant to the Fair Housing Act. That said, the Court notes that Plaintiff's support in the record for a finding of discrimination is lacking.

Plaintiff points to insufficient evidence in the record from which a reasonable person could conclude that CMG engaged in wrongdoing. First, Plaintiff points to an email where she stated that "some lines have been crossed," in the investigation of the Robinson loan. (Pl. Br., ECF No. 56 at 10). In and of itself, this statement does not suggest discrimination. Second, Plaintiff points to conclusory statements from her own deposition testimony stating that there was discrimination. (Id. at 10–11). Plaintiff points to deposition testimony where she stated she reported discrimination, but did not specifically report that Robinson's loan handling was based on discrimination, as "he wasn't the only client that was being troubled being black." (Id. at 11). She also points to her deposition testimony where she responds yes when asked if she told anyone at CMG that she thought the Ellerbe loan was

16

handled discriminatorily, which Plaintiff presents as corroborating evidence of her belief about the Robinson loan. (Id.).

Beyond citing those two portions of her deposition testimony, Plaintiff does not explicitly state in her discussion of the reasonable belief prong the basis for her claims of discrimination. Although Plaintiff presumably intends it should be inferred, in this part of the discussion, Plaintiff does not state that it was race-based discrimination. Looking to the introduction section of her brief, Plaintiff states that "she reported her concerns, twice, about a co-worker who deceptively posed as if she was looking for a job (when she was not) to verify the employment of a black loan borrower of Defendant CMG Mortgage, Inc." (Id. at 7). She further explains that she "testified she believed this was deceptive, fraudulent and/or unlawful conduct because it was deceptive and 'discriminatory,' testifying that 'lines were crossed' and that 'they didn't treat any other customer like this.'" (Id.).

While Plaintiff cites to her deposition testimony where she testified that she believed there was discrimination in the investigation of Robinson's loan, she does not point to any evidence in the record explaining how she came to this conclusion. (Id. at 11). She does not cite to any evidence that demonstrates discrimination or shows that Robinson was treated differently than a similarly situated person of a different race. She does not point to any evidence in the record that Connor, the employee that called Robinson's purported employer, was aware of Robinson's race. In short, Plaintiff has not pointed to sufficient facts to overcome summary judgement. See, e.g., Patterson v. Glory Foods, Inc., 555 F. App'x 207, 211 (3d Cir.

2014) ("[Plaintiff's] mere assertions that he believed that wrongdoing occurred, however, cannot defeat summary judgment, without some evidence to support them.").

Although this finding is enough to require granting summary judgment, the Court will assess the remaining elements necessary for a CEPA claim.

### iii. Protected Whistleblowing Activity

Defendant next argues that Plaintiff did not engage in protected whistleblowing activity under CEPA. Defendant argues that "Plaintiff never reported any allegations regarding Erin Connor or any other fraudulent or deceptive practices or violations of law, and at best merely disagreed with decisions regarding whether to approve or deny her loan applications." (Def. Br., ECF No. 55-2 at 37).

Plaintiff alleges that she did engage in protected whistleblowing activity and she points to an email on January 3, 2022, where she stated that "I feel like this is personal and I know some lines have been crossed. / During my call with employer, I know Erin made a call to him looking for a job." (Pl. Br., ECF No. 56 at 10). Plaintiff also points to her own deposition testimony, stating that she spoke to her supervisor, Heiligman, about the discrimination and he agreed that the way they were handling the file was wrong. (Id.). Plaintiff further points to her deposition testimony stating that she raised the unlawful conduct again on March 25, 2022 in a phone call with Kemi Omotoso. (Id. at 12).

Defendant responds that "[t]he [January 3, 2022] email makes no mention of deceptive conduct or any indication of discriminatory conduct." (Defendant Reply

18

["Reply"], ECF No. 57 at 9). Similarly, Defendant further points to support in the record that the conversations with Omotoso was not about discrimination, but rather the loan verification process and Plaintiff's frustrations with the process. (Id. at 10). Specifically, Defendant points to a follow-up email from the phone call with Omotoso that summarizes parts of the discussion and does not reference Connor. (Id.). In addition, Defendant points to Omotoso's deposition testimony where she unequivocally denied ever having a phone call or email communication with Plaintiff about Connor. (Id.).

Plaintiff has pointed to a disputed material fact as to whether she discussed Connor with Omotoso. However, it is less clear whether Plaintiff has established a genuine dispute where she relies exclusively on her own deposition testimony, in direct contradiction to multiple other documents in the record. This Court however need not decide this point definitively as it has already determined summary judgment is appropriate.

### iv.  Causal Connection

Defendant next argues that Plaintiff is unable to demonstrate a causal connection between her alleged whistleblowing activities and her termination. (Def. Br., ECF No. 55-2 at 37).

To establish this causal link, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) temporal proximity plus some additional evidence of causation. Bowles v. City of Camden, 993 F.Supp. 255, 263–64 (D.N.J. 1998);

accord Hancock v. Borough of Oaklyn, 790 A.2d 186, 194 (N.J.App.Div. 2002)
(citing *Bowles* for the proposition that "[t]emporal proximity, standing alone, is
insufficient to establish causation"). Additionally, a "CEPA plaintiff can prove
causation by presenting either direct evidence of retaliation or circumstantial
evidence that justifies an inference of retaliation." Zaffuto v. Wal–Mart Stores, Inc.,
130 F. App'x 566, 569 (3d Cir. 2005); see also Dominguez v. Costco Wholesale
Corp., 356 F. App'x 611, 614 (3d Cir. 2009) ("A CEPA plaintiff can prove a causal
connection through 'inferences that the trier of fact may reasonably draw based on
circumstances surrounding the employment action.'").

Defendant argues that: "[e]ven if Plaintiff did report Erin Connor's conduct on
March 25, it is indisputable that FIG was investigating Plaintiff's loans as early as
October 2021—6 months prior to the decision to terminate." (Def. Br., ECF No. 55-
2 at 38). Defendant summarizes that, "[i]n short, nothing can change the fact that:
(1) Plaintiff was terminated at the recommendation of FIG based on numerous
instances of potentially fraudulent activity, and (2) CMG's Human Resources
department had no knowledge of FIG's investigation until it was informed of the
decision to terminate Plaintiff's employment." (Id. (internal citations omitted)).

Plaintiff's main argument in support of the causation prong is that the
temporal proximity between her conversation with Omotoso and her termination
demonstrates causation. (Pl. Br., ECF No. 56 at 17). Her second argument is that her
supervisors were not aware of her termination until after the fact, as "Damiani's own
boss (Heiligman) and her boss' boss (Pancoast) did not believe that her job was

remotely in jeopardy days before her termination." (Id. at 18). She states that this undermines the purported reasons for her termination. (Id. at 20).

The fact that Plaintiff's direct supervisor, Heiligman, as well as his supervisor, Pancoast, were unaware of her termination ahead of time has no bearing on the question of causation. Instead, this confirms that Heiligman, who Plaintiff alleged she initially reported the alleged illegal conduct to, was not a decisionmaker in her termination. The decision was made by CMG executives after review of reports from FIG. (SUMF, ECF No. 55-3 at ¶¶ 71–73).

In addition, Plaintiff has not pointed to any evidence in the record that CMG took issue with Plaintiff allegedly whistleblowing Connor's conduct.

With a lack of direct evidence in the record demonstrating causation, Plaintiff relies on the temporal proximity between her alleged whistleblowing conduct and her termination in order to establish causation. A close temporal proximity between whistleblowing conduct and termination may be sufficient to demonstrate causation at the summary judgment level. Here, although Plaintiff's alleged first report of the allegedly discriminatory conduct was in January, she alleges that she again raised the issue of discrimination on a phone call on March 25, 2022. (Pl. Br., ECF No. 56 at 20). She was then terminated on April 6, 2022. (Id.). Whether discrimination was actually discussed between Plaintiff and Omotoso on that March 25, 2022 is clearly disputed. However, if discrimination was discussed on March 25, a jury may determine that the temporal proximity between that conversation and Plaintiff's April 6 termination demonstrates causation. See, e.g., Gallagher v. Adamas Bldg.

Servs., No. 20-13926, 2022 WL 4115748, at *5 (D.N.J. Sept. 9, 2022) ("the Court finds that the temporal proximity between Plaintiff's conduct and the adverse employment action taken against him of days and weeks is unusually suggestive of retaliatory motive and thus a causal link may be inferred.").

Although temporal proximity may establish causation, Plaintiff must also establish that the decisionmaker actually knew of the protected activity. Dominguez v. Costco Wholesale Corp., 356 F. App'x 611, 614 (3d Cir. 2009) (affirming the grant of summary judgment where Plaintiff did not point to any evidence the decisionmakers were aware of his CEPA protected conduct when they made the decision to terminate). Plaintiff's failure to do so here is fatal to this element.

It is not merely the temporal proximity between Plaintiff's whistleblowing conduct and her termination that may establish causation, but the temporal proximity between the decisionmakers' knowledge of the conduct and the termination. See id. at 615 ("Even if [Plaintiff] conducted investigations from January to June 2005, that does not permit an inference of causation without evidence that the managers knew about those investigations."). Although the human resources department communicated the termination to Plaintiff, it is undisputed that FIG presented its report to senior leadership who made the determination to terminate. (SUMF, ECF No. 55-3 at ¶¶ 71–73). Plaintiff has not pointed to any facts in the record that demonstrate that the decisionmakers were aware of her alleged whistleblowing activity in her conversation with human resources employee

22

Omotoso. Thus, Plaintiff has not carried her burden in pointing to evidence of causation.

Plaintiff has failed to point to evidence in the record that supports her prima facie case. As such, summary judgment will be granted in favor of Defendant on Plaintiff's CEPA claim. Although this Court had determined that Plaintiff has not established a prima facie case, it will address the next piece of the analysis as well.

### v. Legitimate, Non–Discriminatory Reason

Where a Plaintiff established a prima facie case, the burden of production then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the employment decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993). Defendant satisfies this light burden by explaining that Plaintiff "was terminated by FIG because of the multitude of problems with respect to her loan applications, including potential fraud, elder abuse, falsification of signatures and other misrepresentations on various loan applications." (Def. Br., ECF No. 55-2 at 40); See Dunleavy v. Montville Twp., 192 F. App'x 100, 102 (3d Cir. 2006) (noting that employer's burden at second stage is "relatively light") (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994)). Moreover, Defendant points to records from FIG demonstrating that loans originated by Plaintiff were under review beginning in October 2021 through March 2022. (Def. Br., ECF No. 55-2 at 40). Fifteen loans originated by Plaintiff were reviewed by FIG. (Id.). This investigation began five months before Plaintiff alleges she first engaged in the purported whistleblowing activity. (Id.).

### vi. Pretext

In refuting the Defendant's stated reasons for termination, Plaintiff must carry her ultimate burden of proving that these reasons are pretextual. To withstand summary judgment, she must point to some evidence, direct or circumstantial, from which a factfinder could either (1) discredit the employer's articulated legitimate reasons or (2) believe that an invidious retaliatory reason was a motivating or determinative cause of the employer's action. Zive, 867 A.2d at 1144 (citing Fuentes, 32 F.3d at 764). To satisfy the first Fuentes prong, which Plaintiff attempts to do here, she need only point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted nondiscriminatory reasons.'" Choy, 2012 WL 253382, *4–5 (citing Fuentes, 32 F.3d at 765). The plaintiff may satisfy this prong and establish pretext without citing anything beyond the evidence proffered to support her prima facie case. Fuentes, 32 F.3d at 764. The Court views the facts collectively, as it must. Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Plaintiff has not carried her burden in demonstrating that Defendant's reason for her termination is pretext. Plaintiff argues that "[t]he fraud report – which was the underlying justification for Plaintiff's termination – is littered with pretext." (Pl.

Br., ECF No. 56 at 23). Plaintiff explains that of the 15 loans that were investigated, ten of them "were approved or funded by CMG." (Id.). Plaintiff states that there is no evidence in discovery to demonstrate that any of the borrowers were contacted about the suspicion of fraud. (Id.). Plaintiff points to testimony from CMG's corporate representative that seven of the 15 investigated loans served as the basis for the decision to terminate Plaintiff. (Id. at 23). Plaintiff argues that five of those seven funded, which she asserts undermines the existence of fraud. (Id.). Plaintiff does not present any other explanation for why these five loans did not appropriately serve as a basis for her termination.

These five loans include the loans for borrowers Carlucci, Villalva, Starrett, Smith, and Ellerbe. (Id. at 24). The FIG Report states that Carucci included fraud based on an undisclosed debt and also includes in the Carlucci investigation information about Plaintiff's relationship with Smart Marketing LLC in violation of CMG policy. (FIG Report, ECF No. 55-17 at 2–5). The FIG Report states that the Villalva loan included a question of occupancy fraud. (Id. at 5–6). The Starrett loan involved a NPI breach when Plaintiff sent borrower information using a non-CMG email address. (Id. at 6–8). That investigation also stated that Plaintiff sent CMG proprietary information outside of CMG. (Id.). The Smith loan included concerns about a straw buyer. (Id. at 8–10). Finally, the Ellerbe loan included issues of forgery. (Id. at 10–12). Although she disagrees with certain of FIG's conclusions, Plaintiff does not dispute that the FIG report sets out each of these issues of potential fraud. Further, Plaintiff does not refute how Defendant's stated reliance on these

25

loans and the fraud issues revealed during their investigation are pretextual. She does not point to any evidence in the record to suggest that CMG did not believe these conclusions or to suggest that CMG took issue with her reporting Connor's conduct. Moreover, in arguing that the fact that the loans funded demonstrates reliance on issues within those loans is a pretextual reason for her termination, Plaintiff does not address the timeline of the investigations. As Defendant points out, the Carlucci, Villalva, and Smith loans all funded about two months prior to the conclusion of the investigations. (Reply, ECF No. 57 at 14). Also, even if FIG had not concluded that there was ultimately fraud, there were at least red flags that Plaintiff did not bring to anyone's attention. Defendant does not need to prove fraud in order to support its explanation that Plaintiff was terminated due to red flags related to fraud.

In addition, with respect to the two loans in the seven that provided the basis for her termination that were not funded, Plaintiff has not demonstrated why reliance on the issues with those loans is pretext. The investigation for the Robinson loan revealed income fraud. (FIG Report, ECF No. 55-17 at 22). Plaintiff attempts to discredit the investigation report by pointing to testimony from the FIG investigator who testified that her finding of fraud did not specify who was committing the fraud, the borrower or the loan officer. (Pl. Br., ECF No. 56 at 24–25). This does not refute the fact that a loan originated by Plaintiff included an issue of income fraud that she, at best, did not flag while processing the application. It is undisputed that a loan officer's responsibilities include flagging potential fraud.

Next, the investigation into the Ursino loan discovered a question of occupancy fraud. (FIG Report, ECF No. 55-17 at 14). This loan application was for a primary residence. (Id.). In support of the concerns of occupancy fraud, the FIG report explains that it noted "the significant distance from the subject property to the employers for both borrowers." (Id.). In addition, FIG uncovered public records demonstrating that the borrowers had refinanced their current primary residence, with Plaintiff's brother at DHI Mortgage, and were required to maintain that property as a primary residence for one year. (Id.). At the time of the loan application with CMG there were still 5 months remaining on this year requirement. (Id.). Plaintiff points to her testimony in which she states that she disagreed with this concern, and alleges that Omotoso thought the way the loan was handled was wrong. (Pl. Br., ECF No. 56 at 26). Plaintiff's testimony that she disagrees with these issues does not support a finding that the concern of occupancy fraud was not a basis for the decision to terminate her.

Plaintiff points to the undisputed fact that her direct supervisor, Heiligman, was not aware of her termination until the day she was terminated nor was his supervisor, Pancoast. (Id. at 27–28). She also points to testimony from Pancoast that her loan production did not warrant a termination. (Id. at 28). This fact is immaterial to the question of whether the stated reason is pretextual as she was not terminated based on her loan production, she was terminated for concerns of fraud. The fact that two supervisors that were not a part of the fraud investigations were unaware of

27

Plaintiff's termination ahead of the fact has no bearing on the credibility of the reason for her termination and thus does not present a material issue of fact.

In addition, Plaintiff fails to address the undisputed fact that these FIG investigations into her loans began five months prior to her first alleged whistleblowing activity. See Choy v. Comcast Cable Commc'ns, LLC, 629 F. App'x 362, 365 (3d Cir. 2015) (citing the fact that the employer had identified problems with Plaintiff's work performance before he first expressed CEPA protected concerns as a fact that "belie[s] a conclusion that [the employer's] reasons for firing [Plaintiff] were a pretext for retaliation.").

Plaintiff has not carried her burden in pointing to facts in the record that demonstrate that CMG's extensive records of fraud concerns related to Plaintiff's loans are a pretextual explanation for her termination. She has not shown weakness or implausibility in Defendant's proffered reasons for the termination. Plaintiff offers no evidence beyond her "rumored, unspecified, and uncorroborated" allegations, so the Court must conclude that she has failed to prove pretext. See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 650 (3d Cir. 2015).

Accordingly, in addition to her failure to establish a prima facie case of retaliation, because Plaintiff has not provided sufficient basis (i) to disbelieve Defendant's explanations for terminating her employment or (ii) to conclude that a retaliatory reason was likely a motivating cause of Defendant's actions, Plaintiff's CEPA claim must be dismissed.

### b. <u>Counterclaim – Breach of Contract</u>

Defendant argues that summary judgment should be granted on its breach of contract counterclaim. Defendant explains that Plaintiff breached her Compensation Agreement by failing "to repay her sign-on bonus after being employed at CMG for less than twelve months." (Def. Br., ECF No. 55-2 at 43).

Plaintiff's only response on the counterclaim is that "CMG cannot be successful on its counterclaim given Plaintiff's triable CEPA claim that presents the ultimate issue regarding her unlawful termination." (Pl. Br., ECF No. 56 at 29 fn. 6).

Under New Jersey law, "[t]o state a claim for breach of contract, [a claimant] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." <u>Frederico v. Home Depot</u>, 507 F.3d 188, 203 (3d Cir. 2007); <u>Gordon v. United Cont'l Holding, Inc.</u>, 73 F.Supp.3d 472, 478 (D.N.J. 2014).

The existence of a contract between the parties is undisputed. When Plaintiff was hired, she signed a Compensation Agreement. (SUMF, ECF No. 55-3 at ¶ 3). This contract explicitly states that is Plaintiff does not work at CMG for a full year, she is required to repay her sign on bonus. (Id. at ¶ 5; Compensation Agreement, ECF No. 55-5 at 4 ("Employee must be employed at CMG Financial at the time the bonus is due and remain employed at CMG Financial for a minimum of twelve (12) months in order for the sign on bonus to be nonrepayable. . . . Employee agrees that the total sum to be repaid shall be withheld from Employee's final variable

compensation paycheck and that Employee shall repay any amount which exceeds the amount of his/her final paycheck at the time of termination.")).

It is undisputed that Plaintiff received the bonuses set out in her Compensation Agreement, and accordingly CMG fulfilled its obligation under the contract. (SUMF, ECF No. 55-3 at ¶ 6). It is undisputed that Plaintiff did not repay her sign-on bonuses. (Id. at ¶ 8). This failure to repay constitute a breach of contract. The damages here are undisputed and clear, equal to the amount of the unrepaid bonus.

The facts underlying Defendant's breach of contract claim are undisputed and constitute a breach of contract as a matter of law. Accordingly, summary judgment will be granted on behalf of Defendant/Counterclaimant on its breach of contract claim.

### IV.    Conclusion

For these reasons, the Court shall grant the defendant's motion for summary judgment. An accompanying Order as of today's date shall issue.

s/ Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated: May 28, 2024